May it please the Court, good morning. I'm Eugene Olofsky. I'm appointed to argue on behalf of Mr. Quan. We're first asking the Court to reverse Mr. Quan's five money-laundering convictions. We made three arguments. I'm just going to stick to one today. One of the three arguments is a Santos argument proceeds that's submitted pursuant to court order without oral argument. I'll just note for the Court that we sent a 28-J letter last week alerting the Court that we think that the Court's Van Alstyne case from the 22nd is very critical to analyzing the arguments of both sides on the Santos proceeds question. The other argument we made is based on the Regalado-Cuellar Supreme Court case design. I think both sides have pretty much briefed that pretty well for the Court. I think I can help the Court the most on the first argument, and the first argument is the Santos arguments. I think I'm required by court order to submit on the briefs on Santos, and but although I'm obviously happy to answer any questions as they come up if I have some time, but the first argument that I want to make for the Court is that, as we say, no rational reason. Why is it? Well, then maybe you could just answer my question. Why is there a merger issue in this case? I don't see it. I think because the SUA, the predicate crime, and the laundering acts, the deposits are really kind of balled up into the same thing. I think I can explain that as I go into this argument, which is basically that no rational reason. Why do the payments to the kids' account have anything to do with the underlying fraud? Or the payments to Pakistan? The so the the Oh, sorry. The payments to the kids' account. Right. Yeah. So the so again, the the deposits of the five checks on August 5th, 2003 are the five money laundering accounts and their proceeds from the sale of property that's 1081 La Conte that's sold by the Jolene, Utah, and then the money goes into the children's accounts. In the indictment, the five checks, those deposits are actually alleged to be part of the Tomei fraud itself. So if you go to paragraph 50 of the indictment, that discusses the deposits, that's incorporated by reference into count 23. Count 23 is the predicate offense. So we think that by virtue of the way the case is charged, it's all balled up. And also, during the closing argument, and this is a transcript 9317, 9318, the government argued to the jury that there were four areas of fraud in the Tomei bankruptcy. One of them was the five checks, the money laundering, the deposits. So so again, the case is the case is charged. The case is charged in a way to ball them all up. The government argued the case in a way to ball them all up. So we're arguing to the court that, first of all, no rational jury could have found that the predicate crime was separate from, this is the court's rule in Estacio and in Savage, no reasonable jury could have found that the predicate crime was separate from the deposits or prior to the deposits. The prior to rule is one that I'm going to get to and I'm going to take a little time on, because we're arguing that the predicate crime has to be finished before it can generate proof. Sotomayor, Well, a phase of it does. Verrilli, Well, you know what? I think that I can convince the court that the phase language is wrong. I know it comes out of other circuit cases. And I think those other circuits, the government cites them and they totally support what the government is saying. I just don't think that this Court should follow what those circuits are saying, because I think it's inconsistent with the actual terms of the money-laundering statute. And I think I can prove it if I actually point you to the language of the statute. I just know that, just to back up, there's a little bit of a dispute between the government and Mr. Kwan about what the actual predicate offense is. Is it count 23, or is it something else? And I just want to make sure that I've stated Mr. Kwan's position pretty clearly. We said that the predicate crime, because it's going to make sense later for my argument, the predicate crime is count 23. The government's brief kind of says, well, not necessarily count 23. I'm scratching my head. I'm thinking, what else could it be? Maybe they're referring to the actual filing of the Statement of Financial Affairs in the Tomey bankruptcy. Maybe that's the case. They say, well, it doesn't have to be count 23. It's just a general concealment act. If you remember the way the Tomey fraud is charged, it's actually charged as a two-year fraud, right, which is why we say it's not finished before the laundering. It's charged to go from April of 2003 to August of 2005, and the deposits, the laundering, occurred here, August of 2005. Now, there's a filing in the Tomey bankruptcy of a Statement of Financial Affairs, and it doesn't have the Leconte transfer on it, and it's filed in July, July 31 of 2003. So you have July 31, then you have a week later, you have the deposits. So maybe the government's part of it. Kagan. So why isn't it finished? I'm sorry? So why isn't it done? So because, well, so I have two reasons. You thought I didn't come with reasons. The first one is that very Statement of Financial Affairs that I just told you about, if you go to count 22, in count 22, paragraph 93C, it's actually charged. It's charged that the Statement of Financial Affairs was false. It's a false declaration, count 22. Yes. But the other one is a concealment. Right. I'm just so I'm just trying to say, is that a possibility to be the predicate crime if the government's trying to get away from count 23 right now? I'm offering maybe that's what they're referring to, the false SFA, supposedly false. However, Mr. Kwan, while the jury convicted him of that count 22, the judge acquitted him. The judge acquitted Mr. Kwan of filing a false SFA on July 23. So I say, no, that can't be the predicate crime. The other reason why that really can't be the predicate crime is the way the case was charged, the actual money laundering count, if you look at the money laundering count, it incorporates, by reference, paragraphs 94 and 95. So look at 94 and 95, and sure enough, they're count 23. Also, the district court, we pointed out in our reply brief, in the district court, the government did argue to the district court at one point that count 23 was the predicate crime. So we, so hence, we, we briefed, we briefed the argument that count 23 was the predicate offense, and quite simply from, first of all, the argument that the allegations were balled up, so there was no separateness, plus the allegations that count 23 goes out to here, and the laundering happens here, you can't have, you can't have the completeness, the separateness. So now the question is, well, maybe that's not really the case. The government argues, relying on some out-of-circuit authority like Castellini and Richard, their first circuit cases, the government is basically saying, I think, well, even if count 23, the Tome bankruptcy fraud, even if that is the predicate, the government didn't have to prove that the entire predicate crime was finished before the proceeds got generated. All it had to do was show that something was done, a part, an act, a phase, whatever you want to call it, and the proceeds started to get generated. And the first circuit case that relies on, and there are other cases in other circuits, I'm not going to kid you, that go, that support the government's argument. I think they carry, they perpetuate a mistake that this circuit should not make. Here it is. The money laundering statute that we're talking about here, which is 1956A1BI, uses the phrase proceeds in two places. And the actual language it says is, a defendant must conduct a financial transaction that, quote, in fact involves the proceeds of specified unlawful activity. Okay? That's the phrase, proceeds of specified unlawful activity. And then it also says in another, in the same provision, and the purpose of the transaction must be to disguise certain attributes of, quote, the proceeds of specified unlawful activity. Well, let's look at the phrase proceeds of specified unlawful activity. 1956C7 defines specified unlawful activity. And it says specified unlawful activity is, quote, any act or activity constituting an offense listed in Section 1961. Bankruptcy fraud is clearly listed in 1961, so we're not, we're not saying that. What we're focusing on is specified unlawful activity is an act constituting an offense. So now proceeds of specified unlawful activity means in the money laundering statute, proceeds of an act constituting an offense. And, and so, so here it is. Yeah, you can have a crime that has a bunch of acts in it, and a bunch of those acts could start to throw up money, but the money laundering statute, guess what? It doesn't, doesn't prohibit laundering of money. It prohibits the laundering of proceeds, which is a statutory term of art. Proceeds of specified unlawful activity. So, hence, because the proceeds have to come from an act that constitutes a crime, the act has to be a crime. It can't, the statute doesn't say any, any act or activity constituting part of a crime, or constituting a phase of a crime, or constituting a substantial step toward a crime. What the statute is telling you, which is what I think this circuit has read Congress as saying. But what's not a crime about filing the false financial statement? I'm sorry? What's not a crime about filing the false financial statement? So if, if the, if the filing of the false financial statement, so to speak, was the phase, I already showed the Court that in Count 22, that was charged, and the Court acquitted Mr. Kwan of filing a false financial statement precisely on the grounds that it didn't mention the transfer. So I'm saying, how can that be an act constituting an offense? It's not, it's not the act of Count 23. Count 23, don't forget, goes the filing is over here, April, July. Count 23 goes to 05, not, not to July 31st of 03. Plus, the Court acquitted Mr. Kwan of that. So now the question is, well, what, what acts? What, what phases? What, what part of Count 23 is supposedly throwing off proceeds if the crime is not completed? And I will say that the, like, Castellini and Richard case in the First Circuit, and there's, there's a case in the Third Circuit, Conley, that goes against me. I think there's one in the Fourth. I better stop. I don't want to list all the other ones. But, but I really do. Do you want us to step out of the box here and ignore all the other circuits in the construction of a major criminal statute? Yeah, that's true. I, I think that every, I think that. I just wanted to be clear. Well, well, again, I think that it, I think, and I, I think the Court said every circuit has its obligation to construe the statute, and this Court has not really gone that way. I think Estacio and Savage are quite, and if you look at the, just the last point, and then I want to, I want to ruin it, but the, the Castellini and Richard case, if you read those, they go back and cite cases like U.S. against Mancarius, which is a Seventh Circuit case, and Mancarius makes the, it's a good example because it makes the fundamental mistake. Mancarius says, well, you know what, if, if you have a mail fraud, a mail fraud can generate proceeds before the mailing. You know, if I go, if I go to you, Judge Smith, and I, and I trick you into giving me some money, and then two weeks later I mail you, you know, the lulling statement, the, the money is generated, isn't it, before the mailing? Yeah, the money is, but guess what? It's not until the mailing occurs that the crime is committed, and it's not until the crime is committed that the proceeds, that the money becomes proceeds for purposes of the money laundering act. So I would say that in, in this case, it's the combination of that argument that the, the crimes were not separate, plus, I don't want to keep beating that. I'm just, I want to, I want to use. Kagan. Let's move to another horse. I want to use some time to. Okay. Here, here's, here's the issue in which I've got the most trouble, and it's something that the circuit did do, and that's the Millett issue. Right. On, on inside or outside fraud, I don't understand it. Yeah. So I'm looking to you and counsel for the government to explain to me what you think it may, how you think it plays out in, in this case, because at least superficially it would appear to me that the scheme here was to defraud 2W and my phone, I don't get the concept. So whatever you can do to enlighten me, I would appreciate it. Yeah. So, so in our, in our reply brief, we, we tried to argue and show the Court how if there was a scheme against 2W or against the Mayfoe group, that the scheme is not against them except insofar as they are participants in the bankruptcy process. Well, that, that argument just doesn't hold up to me, because obviously anybody that you defraud outside of a bankruptcy context can, in fact, if you do declare a bankruptcy, become a player in the bankruptcy proceedings. So that can't insulate them from, can it? I don't know what you mean about insulate. So there's two, there's two statutes. Well, I mean, it can't insulate the, it can't make the outside fraud inside, simply because eventually bankruptcy is declared and those people become players. But I, I think that, so the way I've approached the Court's ruling in Millwid is 152 covers all of the inside bankruptcy fraud. All statements, hiding assets. The relationship between the perpetrator and the victim, say, is one that is borne out of the bankruptcy process. I think that Millwid, the Court says, has got to be outside the bankruptcy, which means in this case, for example, the filing of the document under the Millwid  Right. But, but again, we're not saying that that has to be false. That can be totally true under 157. The filing can be totally true. All it has to do is effectuate a scheme or artifice to defraud. Yeah. And why wasn't the artifice to defraud not paying off W-2 and, and MiFoAD by, by putting the whole Leconte transaction way under the radar? So the, so I, I think the answer, as I said in the brief, and I wish I'd say it clearer, is that 2W is owed money by virtue of another property, 935 Folsom. I understand that. So in other words, the, the, if it's, if, if 2W loses money because the Leconte transaction, a property that doesn't have any interest in, because the Leconte transaction goes on, hidden from it or whatever, the only way that 2W suffers is because it can't get its 1.9 million on another piece of property that it has rooted in another piece of property, and that's because the transfer affects the size of the bankruptcy estate. And if the transfer affects the size of the bankruptcy estate, there's less for 2W to get. 2W is injured in its capacity as a bankruptcy creditor. And I think that's the best way maybe to look at this Courts Millwick case, inside, outside. Look at the victim. Look at the victim class. If the victims are, have their status in relation to the perpetrator solely by virtue of bankruptcy process relationship creditor, as opposed to they have a, a relationship outside bankruptcy in Millwick, for example, the relationship between Mr. Millwick and the landlords. So I think if you, if you, that's a, quite a, an easy way to apply the Millwick rule that this Court fashioned. And I think if you do it that way, you can see that people like 2W, who lost money by virtue of having an interest in another property, because this property over here didn't go into the estate, therefore, there was less in the estate, then you would see that they are injured in their capacity as bankruptcy creditors. Thank you. Anything else? No, I. Okay. Thank you, Mr. Lawski. Ms. Hallert. Good morning. May it please the Court. I'm Kirby Heller, and I represent the government. Let me begin with Count 21 in the bankruptcy fraud case and, and to restate what we think the scheme is and why that satisfies what the Court said in Millwick. Really, the scheme is exactly the way you characterized it, Judge Reimer. That is, Tommy had two assets. It had 2W. I'm sorry. It had two assets. It had the property at 935 Folsom, and it had, before it transfers it, the property at LeConte. And in connection with those properties, it had these creditors. And it was very concerned, or Quan was very concerned, that he couldn't pay off these creditors who were at his door seeking to foreclose. And as the MIFO group, for example, they were just waiting for this transfer to take place, the results of the foreclosure sale from LeConte LLC back to Tommy. They were waiting for that to happen. 2W also was, was waiting to foreclose on the 935 Folsom property. And Mr. Quan decided to transfer this property without any consideration to another one of his companies to accomplish two goals. And he testifies to this. He says he wants to delay MIFO from foreclosing on LeConte property, but he also says he wants to keep 2W from going after it. Now, it is true that they have security in a separate piece of property, but he testifies that he's worried about 2W going after LeConte as well. Now, this is a sufficiency challenge, and of course, the jury is entitled to rely on that evidence to decide what his scheme is. Now, of course, it turns out, so his creditors, and let's specifically talk about 2W, has a legal interest in, in fulfilling its debt from Tommy, aside from the bankruptcy context. All this takes place before Tommy, LLC, files for bankruptcy. And as to the MIFO group, actually, his scheme works, is able to pay, pay them off. But as to 2W, it doesn't work. They're not paid off. They're about to foreclose. Something's about to happen on July 8th or July 10th, and Tommy, therefore, files for bankruptcy, which, of course, it's entitled to do. But then it files these false, these declarations which conceal the fact that it previously had transferred the LeConte property. It doesn't disclose it. So 2W is unable to exercise the legal right it had to collect from Tommy, both before bankruptcy and now during bankruptcy. And I don't believe there's anything in Millwhip that says that the acts have to be completely distinct. In fact, they can't be completely distinct because, as you said, once it gets into bankruptcy, individuals that were creditors before are now creditors in bankruptcy. And, in fact, that's just what you see in the Millwhip case. The charged victims, of course, the government didn't prove the scheme that was charged in the indictment, but the charged victims were the landlords. And what the Court said about them is the scheme as charged was to keep those landlords who are creditors because they had default judgments from exercising their legal rights to collect the monies owed because of this sham bankruptcy. By the same token, Mr. Kwan intended for his creditor, 2W, which had a legal right for filing for bankruptcy, but then hiding an asset from its creditor. And in that case, one can't say that the bankruptcy filing was untethered from the scheme. It's all part of the scheme. And, in fact, the scheme continues, because then what happens is Mr. Kwan, who really just wants to keep this property under his control, it's not that he doesn't ever intend to pay his creditors, but he wants to control it, he doesn't want the legal processes that govern these proceedings to determine who and when and how much gets paid. So he declares bankruptcy, he gets the protections of the automatic stay, but then outside of bankruptcy, he sells the LeConte property, and, in fact, he pays off 2W outside of bankruptcy without the bankruptcy court knowing that there's this asset available, and, in fact, he's using it to pay on his own. So it's all part of a scheme that certainly starts outside of bankruptcy. Ginsburg. So you basically suggest that we give credence to this outside-inside, or we look to the statute? Certainly, we should look to the statute, and there could be many schemes that fall under both. In fact, the scheme started before bankruptcy, continued into bankruptcy, and then did fall under a Section 152 scheme, a 152 offense and a 157. And I think it's important to look at why Milwitt made that point and why it was making that point, because that point has really never been developed after that case, and I haven't been able to find that in any other case. And they were using that point to reject a government argument that was raised for the first time on appeal, that, in fact, maybe because the government had improved this scheme against the landlords, that maybe there was bankruptcy fraud because the defendant filed the sham bankruptcy petition knowing that the tenants were, in fact, able to pay their debts. And the Court said no for many reasons, but one reason is that was completely untethered, as the Court said, from the underlying scheme. So, for example, that could have been a 152 offense, but wouldn't be a 157 offense. Here, one, you know, one could have a 152 offense, for example, and this Court has dealt with this, when a defendant, in response to the question, have you filed for bankruptcy before, and the defendant says no, when, in fact, he has. That violates section 152, but, you know, unless there's some other scheme in general, wouldn't violate 157. So there are elements that differentiate them, but it doesn't mean that schemes can't fall under both. And we believe that really is the point that Milwitt was trying to make. It can't simply be a false filing in a bankruptcy claim that's unrelated to a scheme. If you can address the predicate crime argument. Yes. First of all, our point in our brief that the money laundering counts didn't intend to charge the conduct underlying count 23. I'm sorry. We didn't we certainly didn't mean to imply that the conduct underlying count 23 is not the SUA in that case. The specified unlawful activity that's the predicate crime for the money laundering is the concealment of Tommy's interest in the LeConte property. That was the basis of count 23, and it is what we intended the predicate crime to be in the money laundering counts. And our only point was the charging language in the statute didn't say that, I'm just looking for the, that it represented the proceeds of the crime charged in count 23. That could theoretically change the analysis. We just, the charging language said the proceeds of this concealment crime, section 152.7. And it is our position that that offense was certainly completed sufficiently to generate proceeds when Mr. Kwan did not, did not disclose, when he concealed Tommy's transfer of the property from the bankruptcy court. And that was completed at the end of, at the end of July. The money laundering then took place, you know, several days later. And I think this Court, this is pre-Santos, but has stated in the case of the United States, that our proceeds of a concealment fraud were, in that case it was stores and real property that were concealed. They were proceeds when they were admitted from the bankruptcy petitions, and that's basically our position here. Now, the reason, in fact, that the count 23 goes all the way to 2005 is because even at the, that was the date of the superseding indictment. And even as of the date of the trial, Tommy was still in bankruptcy. And so, and so throughout the period, at least until the date of the superseding indictment, its interest still hadn't been disclosed. It doesn't mean that at the time when he initially filed those petitions and didn't disclose the transfer, that it didn't generate proceeds. I don't, I didn't take this Court's order saying we shouldn't discuss Santos as meeting. We can't talk about what's happened since then. I understood. Ginsburg. I mean, that, that order came out, and then obviously the Ninth Circuit case, Santos came out separately. Right. So if I can just address how that applies to this case. In Van Alstyne, which is, like Santos, is a promotional money laundering case, unlike ours, which is a concealment. The Court emphasized that to deal with these fractured opinions. In Santos, the way to make most sense of it is that the Court, at least the plurality in Justice Stevens, were concerned about the merger problem, and the Court, this Court then developed a very fact-intensive approach to try to determine when proceeds mean profits, and in the Court's view, that occurs when the particular crime at issue depends on necessary payments. Well, of course, that's not the case here, because the crime at issue is the concealment from the bankruptcy court. It's failing to disclose the transfer. And once that's done, as I've just mentioned, you know, that crime is certainly completed, and the transfer of the money to the children's accounts really has nothing to do, but it's certainly not a necessary payment that relates to concealing the transfer from the bankruptcy court. Sotomayor, would you read Van Alstyne? Does that mean that the question then is whether the transfer to the kids' account are gross receipts of the? Well, I read Van Alstyne as if there isn't a merger problem, and we don't see a merger problem here, then it can be gross receipts, yes. And that's, in fact, the third count that the Court did not reverse in Van Alstyne were payments to one of the investors who was complaining of wanting his money back or else the jig would be up. And so what this Court said, in fact, although that promoted the crime, it kept it from being brought to the attention of the authorities, it wasn't a necessary payment to keep the crime going, and there it seemed like, I assume, that those were gross receipts. There was no discussion of profits at all. Anything else, Mark? Those were the issues I wanted. Okay. Thank you. Nothing else from him. Okay. Thank you, counsel, very much for your argument. The matter just argued to be submitted. Are you okay to keep going? Mm-hmm.
judges: Rymer, McKeown, Smith M.